# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

HIGHLAND BEEF FARMS, INC.,
a Virginia corporation,

      Plaintiff,

                                 No.

v.

LISA D. JONES, an individual;
NATIONAL SUPPLY NETWORK, LLC,
a Virginia limited liability company;
GILMAN CHEESE CORP.,                 **Jury trial demanded**
a Wisconsin corporation; and
WESTERN'S SMOKEHOUSE, LLC,
a Missouri limited liability company,

      Defendants.

## COMPLAINT
## FOR DECLARATORY, INJUNCTIVE AND MONETARY RELIEF

## TABLE OF CONTENTS

Introduction (¶¶ 1-7) . . . . . . . . . . . . . . . .   1

Parties, Jurisdiction and Venue (¶¶ 8-15) . . . . . . . . .   4

Factual Allegations (¶¶ 16-140) . . . . . . . . . . .   6

    Jones' Employment with HBF (¶¶ 16-50) . . . . . . .   6

    Jones' Scheme with Gilman Cheese Corp. (¶¶ 51-96) . . . . .   12

    Jones' Scheme with Western's Smokehouse, LLC (¶¶ 97-136) . . . .   21

    Jones' Own Description of Her Schemes with

        Gilman and Western's (¶¶ 137-139) . . . . . . . . .   30

    Select Summary of HBF's Revenue Losses

        Due to Defendants' Acts (¶ 140 (a)-(q)) . . . . . . . . .   31

Count I (¶¶ 141-155):  Jones' Breach of Contract under Virginia Common Law . . .   33

Count II (¶¶ 156-170):  Jones' Breach of Tort Duty of Loyalty

        under Virginia Common Law . . . . . . . . . . .   36

Count III (¶¶ 171-187):  Jones' Tortious Interference With HBF's Existing

        Contract, Business Expectancy or Prospective Business Relations . . . .   38

Count IV (¶¶ 188-206): Gilman's Tortious Interference with HBF's Existing
  Contract, Business Expectancy or Prospective Business Relations .   .   .   .   42
Count V (¶¶ 207-224): Western's Tortious Interference with HBF's Existing
  Contract, Business Expectancy or Prospective Business Relations   .   .   .   45
Count VI (¶¶ 225-238):  Jones' Violations of Virginia Uniform
  Trade Secrets Act .   .   .   .   .   .   .   .   .   .   .   .   .   .   47
Count VII (¶¶ 239-255): Gilman's Violations of Virginia Uniform
  Trade Secrets Act .   .   .   .   .   .   .   .   .   .   .   .   .   .   50
Count VIII (¶¶ 256-272): Western's' Violations of Virginia Uniform
  Trade Secrets Act .   .   .   .   .   .   .   .   .   .   .   .   .   .   52
Count IX (¶¶ 273-286): Jones' Tortious Conversion of Property
  under Virginia Common Law   .   .   .   .   .   .   .   .   .   .   .   55
Count X (¶¶ 287-300): Jones' Civil Fraud against HBF under
  Virginia Common Law   .   .   .   .   .   .   .   .   .   .   .   .   57
Count XI (¶¶ 301-305): Civil Fraud against HBF by Gilman and Western's
  under Virginia Common Law .   .   .   .   .   .   .   .   .   .   .   60
Count XII ( ¶¶ 306-313):  Jones and Gilman's Violations of Va. Code § 18.2-500,
  Statutory Civil Conspiracy   .   .   .   .   .   .   .   .   .   .   .   61
Count XIII (¶¶ 314-317): Jones' and Gilman's Civil Conspiracy
  under Virginia Common Law   .   .   .   .   .   .   .   .   .   .   62
Count XIV (¶¶ 318-325): Jones and Western's' Violations of Va. Code § 18.2-500,
  Statutory Civil Conspiracy   .   .   .   .   .   .   .   .   .   .   .   63
Count XV (¶¶ 326-329): Jones' and Western's' Civil Conspiracy
  under Virginia Common Law   .   .   .   .   .   .   .   .   .   .   64
Count XVI (¶¶ 330-334): Jones' Unjust Enrichment at HBF's Expense   .   .   .   65
Count XVII (¶¶ 335-339):  Gilman's Unjust Enrichment at HBF's Expense   .   .   .   66
Count XVIII ¶¶ 340-344): Western's' Unjust Enrichment at HBF's Expense   .   .   68
Prayer for Relief  (¶¶ 345-350)   .   .   .   .   .   .   .   .   .   .   .   69
Jury Trial Demand  (¶ 351)   .   .   .   .   .   .   .   .   .   .   . 72
Signatures of Counsel   .   .   .   .   .   .   .   .   .   .   .   .   .   72

## **INTRODUCTION**

1.     This suit seeks redress for the economic and reputational damage the

Defendants have done to a northern Virginia family business, Highland Beef Farms, Inc.

("HBF"), a Reston-based food distribution and private labeling company. The harms set forth

in this Complaint resulted from the corrupt side-dealing of Lisa Jones, formerly HBF's

director of new business development, in concert with the co-Defendants, two food

manufacturers that had business dealings with HBF for many years. Together the three Defendants cut HBF out of business transactions with its own customers, and with customers that HBF was paying Jones to develop, and enriched themselves at HBF's expense.

2.     HBF employed Defendant Jones from 2013 to 2018. After Jones resigned from HBF as of February 2, 2018, HBF discovered that she had been secretly competing with HBF in her side business for over a year, while HBF was paying her a weekly salary plus quarterly sales commissions, and even though in 2015 she had signed a loyalty, confidentiality, non-disclosure and non-use agreement.

3.     In exchange for private broker's fees or commissions, Jones engaged in business conspiracies with Defendants Gilman Cheese Co. ("Gilman") and Western's Smokehouse, LLC ("Western's"), by connecting them with HBF's existing customers and with potential buyers that HBF was paying her to develop into active HBF accounts. Jones hid her wrongdoing, *inter alia*, under cover of false assurances to her employer that certain markets for its products were unlikely to materialize -- even while she was secretly exploiting those very markets for her personal gain, at HBF's expense and to HBF's detriment.

4.     In these separate conspiracies with Gilman and Western's, described in detail below, Jones deprived HBF of millions of dollars in sales that she was being paid to generate for her employer. In so doing, she breached her duties of loyalty and fidelity to HBF, and her binding, freely undertaken obligation to do nothing that would subordinate HBF's interests to a competitor's or to her own.

5.     To further her willful misdeeds and to enrich herself personally, Jones surreptitiously misappropriated HBF's business methods and proprietary customer information, including virtually its entire store of data on its customers' buying histories, financial condition, creditworthiness, key personnel, and business relationships, thus

diverting HBF's trade secrets to her own illicit use and savaging her employer's respect and goodwill in the marketplace.

6.    Personally and/or through her company, defendant National Supply Network, LLC ("NSN" or "Jones' corporate persona NSN"), Jones still maintains private brokering relationships with Gilman and Western's, using information she misappropriated from HBF, and tarnishing HBF's good name to the economic and reputational detriment of HBF.

7.    This suit is brought to declare the Defendants liable as alleged, to enjoin their further misconduct, and to recoup some of the losses their perfidy has caused.


## PARTIES, JURISDICTION AND VENUE

8.    Plaintiff Highland Beef Farms, Inc., is a for-profit corporation based in Reston, Virginia, that has built its expertise for more than four decades in the distribution of shelf-stable meat and cheese products throughout the United States. In the interstate chain of commerce, HBF develops its food products with upstream producers, and brands them with private labels or otherwise distributes them for its downstream customers.

9.    HBF's headquarters and corporate offices are located at 1317 Deep Run Lane, Reston, Virginia 20190.  HBF was founded by Jay and Patricia Hersch, the company's President and Vice President respectively, who have been married to each other for almost 50 years. At the time of this filing HBF has six employees and two consultants in addition to the two co-owners.

10.    Defendant Lisa D. Jones, on information and belief a resident of Virginia, is a former employee of HBF.  Her last known address of record is 25186 Ship Sq., Chantilly, VA 20152.

11.     Defendant National Supply Network, LLC, is a Virginia for-profit limited liability company that was established in 2017 while defendant Jones was an HBF employee. NSN functions as Jones' corporate persona for her personal pursuit of brokering and otherwise engaging in commerce relating to food products, a pursuit she kept secret from HBF until after she resigned from her employment there.

12.     Defendant Gilman Cheese Corporation ("Gilman") is a Wisconsin for-profit corporation, established under the name Drangle Foods, Inc., in 1946, and known by its current name since 2010. Its headquarters and corporate offices are located at 300 S. Riverside Drive, Gilman, Wisconsin 54433. Its Chief Executive Officer/CEO and registered corporate agent is Thomas P. Hand, of the same address. The company is a manufacturer of shelf-stable cheese products, and for many years has provided one of HBF's key upstream suppliers, Old Wisconsin Sausage Co. ("Old Wisconsin"), with cheese products for use in meat-and-cheese "combo" stick products that HBF has private-labeled. Gilman and HBF have had business interactions for several decades.

13.     Defendant Western's Smokehouse, LLC ("Western's"), is a Missouri for-profit corporation, established in its current form in 2013. Its headquarters and corporate offices are located at 1978 Western Drive, Greentop, Missouri 63546. Its Chief Operating Officer/COO and registered agent is Kevin Western, of the same address. The company is a manufacturer of shelf-stable meat products, and has supplied HBF in the plaintiff's private labeling and distributor business. HBF's business interactions with Western's go back to 2015.

14.     Because defendants Gilman and Western's are citizens of states other than Virginia, where HBF resides, and because the amount in controversy in this action exceeds $75,000, this Court has diversity jurisdiction under 28 U.S.C. § 1332.

15.     Venue is properly laid in this District and Division because plaintiff HBF is located in Fairfax County, Virginia, which is within the Eastern District's and Alexandria Division's catchment area under 28 U.S.C. § 127(a) and U.S. Dist. Ct. (E.D. Va.) Loc. R. 3(b)(1).

## FACTUAL ALLEGATIONS

### Jones' Employment with HBF

16.     Defendant Jones began working at HBF on or about August 26, 2013. She was originally hired as an assistant to Jay Hersch, HBF's President and co-owner.

17.     After she became an employee of HBF, Jones signed two documents relevant to this action: a confidentiality, non-disclosure and non-use agreement ("CNDNU Agreement"), and an acknowledgment of receipt of the complete HBF Employee Handbook setting forth HBF requirements for employee conduct.

18.     Paragraph 1 of the CNDNU Agreement that Jones signed expressly defined "confidential information" to:

> include **all information of any kind regarding** [HBF], or its employees, officers, **vendors [or] customers . . .**
> > (i) **that Employee learns** during the period of Employee's employment with [HBF],
> > (ii) which is not generally available to the public, and
> > (iii) **the disclosure of which has the potential to harm [HBF] or its business and/or assist [HBF]'s competitors.**         (Emphasis supplied.)

19.     In its definition of confidential information in Paragraph 1, the CNDNU Agreement that Jones signed expressly "include[d] . . . by way of example":

> > (A) customer lists;
> > (B) pricing policies;
> > (C) sales information;
> > (D) business plans;
> > (E) secrets;
> > (G) prospective trademarks;

(H) payment terms and terms of sale;
(I) marketing plans;
(J) marketing knowledge and/or information;
(M) financial information; and
(N) vendor pricing.

20.    Paragraph 1 of the CNDNU Agreement expressly provided that Jones:

agrees to **restrict disclosure** of Confidential Information as defined [above] to those disclosures that are **necessary and appropriate for the performance of Employee's assigned job duties for [HBF] and that are made solely for benefit of [HBF].**                                      (Emphasis supplied.)

21.    Paragraph 1 of the CNDNU Agreement expressly provided that Jones:

covenants not to use confidential information in any way to the detriment of [HBF] or its affiliates even if that confidential information is not disclosed to third parties.

22.    Paragraph 2 of the CNDNU Agreement expressly provided that Jones:

understands and acknowledges that [HBF] will suffer irreparable harm in the event of a breach of the obligations imposed by Paragraph 1 of this agreement and that monetary damages will be inadequate to compensate [HBF] for such breach . . . [and] agrees that, in the event of a breach or threatened breach of any of the provisions of Paragraph 1, [HBF] will be entitled to equitable relief, including but not limited to a temporary restraining order, preliminary injunction and permanent injunction in order to prevent or restrain any such breach. [HBF] shall also have the right to recover its reasonable attorneys' fees and costs as a prevailing party, to the extent that [HBF] substantially prevails in its claims.

23.    The Employee Handbook Acknowledgment that Jones signed expressly provided:

The employee handbook describes important information about [HBF] . . . I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it.

24.    Jones thus voluntarily accepted, and pledged to fulfill, the obligation to comply with all policies in the Handbook as a condition of her employment with HBF.

25. Section 104 of the Employee Handbook expressly provides:

> Employees owe a duty to [HBF] and its customers to act in a way that will merit their continued trust and confidence. [HBF] expects [its] employees . . . to refrain from any illegal, dishonest or unethical conduct.

26. Section 107 of the Employee Handbook further provides:

> Employees have an obligation to conduct business within guidelines that **prohibit actual or potential conflicts of interest.** . . . An actual or potential conflict of interest occurs **when an employee is in a position to influence a decision that may result in personal gain for the employee** . . . if employees have any influence on transactions involving purchases, contracts, or leases, **it is imperative that they disclose to an officer of [HBF] as soon as possible** the existence of any actual or potential conflict of interest . . . (Emphasis supplied.)

27. Section 108 of the Employee Handbook expressly provides:

> Outside employment that constitutes a conflict of interest is prohibited. **Employees may not receive any income or material gain from individuals outside [HBF] for materials produced or services rendered while performing their [HBF] jobs.**                              (Emphasis supplied.)

28. Within the first few months of her employment, Defendant Jones and HBF management agreed that she would be HBF's Director of New Business Development, and that she would perform sales functions in addition to her other responsibilities.

29. HBF decided that Jones would continue to receive her weekly salary, plus quarterly commissions based on the volume of food products she sold to HBF's customers.

30. From at least January 2017, and continuing at least until she left HBF on February 2, 2018, Jones displayed disloyalty to HBF and competed with HBF. Her competition with HBF has continued up to the present. Her disloyal and/or competing actions have included, without limitation, the use of HBF intellectual property, tangible assets and business resources, as well as HBF's existing and potential customer base, for her own commercial objectives rather than those of the HBF enterprise; and the disparagement of HBF and its management and the tarnishing of its business reputation.

31.     Jones did so in violation of the CNDNU Agreement that she signed, as well as HBF policies set forth in the Employee Handbook that she voluntarily accepted the duty to uphold as a condition of her employment.

32.     Jones' disloyalty included tarnishing HBF management's reputation even while she promoted herself as HBF's "Director New Business Development." A clear example appears in the email that Jones sent on August 23, 2017, to the national account manager at Darlington Snacks, a baked goods manufacturer and supplier:

> [T]**he owner of our company** [HBF] works with them [Texas Dept. Criminal Justice/TCDJ] and he **bugs the c\*\*p out of them.  They know me but using our name** [HBF] **might be a turn off.**  I could also say the same with Jeff [who was with Eagle Commissary, an HBF customer] and Art [with Jenny Service Co., an HBF customer] .... **they know me and like me but they hate the owner of our company, so I would say Lisa Jones** who works for Highland Beef Farms gave me your contact ...." (Emphasis supplied.)

33.     While working for HBF, Jones was introduced by HBF's management to executives at defendant food manufacturers Gilman and Western's, with instructions to grow the business of HBF through dealings with each of them.

34.     HBF's owners often directed Jones, while she was a paid HBF employee, (a) to grow existing markets, *e.g.*, HBF sales to schools, food banks, and distributors of food in programs operated by the U.S. Federal Emergency Management Agency ("FEMA"); and (b) to identify opportunities and promote HBF sales in new markets of interest to HBF, including food distributors and end users.

35.     Repeatedly, HBF's management pressed Jones for details concerning her efforts to achieve these HBF objectives.

36.     Details that HBF management asked Jones to provide with respect to these existing and potential markets and outreach efforts included, without limitation:  contact information, market information, and program requirements, *e.g.*, product type requirements,

shelf-stability requirements, product weight limitations, nutritional content requirements, ingredient requirements, shipping parameters, pricing requirements, and insurance requirements.

37.    However, for much of the time Jones was employed as HBF's director of new business development, she failed or refused to give HBF specifics concerning the outreach she had been assigned to perform. She failed to enter such information completely or thoroughly in HBF's "Salesforce" customer relations management database software, or otherwise to provide HBF with useable details about those efforts and their result.

38.    As HBF later learned, Jones was misusing HBF resources to promote Gilman and Western's products that HBF did not sell, pocketing commissions or brokerage fees from sales of these products to HBF customers, cutting HBF out of the chain of distribution, and hiding her activities from her employer.

39.    Instead of working solely for HBF's benefit while employed as its Director of New Business Development, Jones secretly arranged for many months to receive fees and/or commissions directly from Gilman and Western's on sales that she personally arranged for each of them with HBF's customers and potential customers, all to HBF's economic and reputational detriment.

40.    Jones arranged these sales on HBF company time and using HBF resources, and she created secret accounts for these customers that she hid from HBF.

41.    HBF did not learn of Jones' disloyal activities -- including her secret dealings with Gilman and Western's and her secret conversion of existing and potential HBF customers that she had identified and developed at HBF's expense -- until after Jones left HBF's employ in February 2018.

42.     HBF discovered after Jones' departure that she had attempted to delete from her HBF computer her unauthorized email correspondence with existing and potential HBF customers, and with Defendants Gilman and Western's. As HBF also discovered, Jones' effort to cover her tracks was incomplete and unsuccessful.

43.     On information and belief, since Jones' resignation from HBF in February 2018, she has continued to conduct her private brokering business with Defendants Gilman and Western's, both directly and under the auspices of Defendant NSN, a business that she secretly incorporated while an HBF employee in order to further her illicit dealings.

44.     Defendant Jones conducted these activities using contacts and other information that she had acquired, compiled and/or organized while she was HBF's employee, and that therefore was proprietary to HBF.

45.     From at least January 2017 through the end of her HBF employment, Jones often held herself out to third parties as HBF's "Director New Business Development" in communications in which she furthered her own unauthorized enterprise and the interests of food suppliers other than HBF.

46.     In doing so, Defendant Jones misappropriated HBF's property by using her HBF email address and her HBF job title to compete with HBF, undercut HBF in its own marketplace, and harm its reputational as well as economic interests.

47.     Both while and after she was HBF's director of new business development, Jones secretly exploited contacts, resources and knowledge she accrued at HBF in order to enrich herself in competition with HBF as a broker for defendants Gilman and Western's.

48.     The activities of Gilman and Western's, respectively, in concert with Jones effectively created an alternative channel of commerce similar or identical to the one already

established through HBF, but one which cut HBF out of the distribution chain in a manner that harmed HBF's existing and expected business and business relations.

49.     By misappropriating HBF's trade secret information, Defendant Jones deprived HBF and its owners of millions of dollars in actual or potential sales that she had been entrusted by HBF to generate for HBF.

50.     Jones and her co-Defendants thus deprived HBF and its owners of the economic profit and other business benefits of those transactions.

### *Jones' Scheme with Gilman Cheese Corp.*

51.     As described in the following paragraphs, Defendants Jones and Gilman secretly advanced a scheme to market Gilman "cheese sticks" to actual and potential HBF customers without involving HBF, although HBF had introduced Jones to Gilman as HBF's representative and encouraged a business model in which both Gilman and HBF had cooperative roles for certain markets in which HBF had expertise.

52.     In several conversations with Gilman CEO Thomas P. Hand in 2015, HBF President Jay Hersch discussed developing private label cheese sticks that Gilman would produce to HBF specifications for HBF to sell into the school market.

53.     The dialogue between Messrs. Hersch and Hand resumed in spring 2016. In an email to Mr. Hand on March 28, 2016, Jay Hersch wrote:  "[M]y marketing rep in the youth market [*i.e.*, Lisa Jones] has also been working with some of the large feeding programs . . . [and] has identified the need for cheese bricks and bars for a potentially very sizeable contract[.]"  By email dated March 31, 2016, Mr. Hersch thanked Hand for working with Jones.

54.     However, by late April 2017 Jones and Gilman were executing plans to market Gilman cheese sticks to actual and potential HBF customers without involving HBF.

55.    On April 30, 2017, Gilman's President, Tom Hand, wrote Jones an explicit statement of their private brokerage arrangement for sales of Gilman products to Jones' chosen customers, as follows:

> I am happy that you will be selling our cheese bars. I would like to confirm the logistics of our new relationship.
>
> 1.    Your LLC/own company will act as our broker for all transactions. Consequently, all orders and any questions dealing with the customers will flow through you.
> 2.    Gilman wants to net $.24 per one ounce bar and $.38 per two ounce bar for FOB Gilman orders. You will determine the price to the customer based on our desired net . . . You will be paid the difference between our desired net and the price we charge the customer.
> 3.    Gilman has no issues if you charge a different amount to different customers. However, we would prefer that you make the same commission on each item you sell to a particular customer. For instance, Company A you make $.02 per bar on all items and Company B you make $.03 per bar for all items.
> 4.    We generally pay brokerage for a PO the month after we get paid by the customer.
> 5.    Kaitlin, our Customer Service rep, will be your primary contact.
> 6.    Gilman will agree to certain stocking levels as you see necessary to fulfill customer needs.

56.    Gilman knew, at the time of this exchange with Jones, that she was HBF's employee, that she had acquired from HBF whatever knowledge or information she possessed about the relevant field, and that she was deliberately disserving HBF's interests, and serving Gilman's and her own, in the transactions that she and Gilman were discussing and executing.

57.    On or about May 4, 2017, Jones sent Gilman a completed IRS W-9 form for herself, confirming her expectation to be paid directly by Gilman according to the arrangement detailed in Paragraph 55 above.

58.    Meanwhile, in January 2017, an inquiry was sent to Jones' HBF email account by Jenmax Foods ("Jenmax"), a California-based distributor that for many years has been a

customer of HBF, asking whether certain cheese sticks that Jones had offered to sell to Jenmax were in HBF's inventory. Jones replied to Jenmax in an email on January 19, 2017, sent from her HBF email account and carrying her usual signature as HBF's "Director New Business Development," as follows:

> I just now refer everyone direct to Gilman whom would of [*sic*] made our [HBF's] cheese sticks so you will get a better price [happy face emoji].  They would have been the ones to make our [HBF's] cheese sticks for us [HBF]."

59.    On January 23, 2017, Jones wrote to Gilman about Gilman's development of a reduced-fat, low-sodium cheese stick, which was not yet an HBF project.  By email marked as "high importance" on March 15, 2017, Jones stressed to Hand -- without copying anyone at HBF -- that the Cleveland Food Bank in Ohio was interested in Gilman cheese bars in addition to HBF products.  Jones further noted in this email, "I am not interested in creating our own label [*i.e.*, an HBF private-labeled product] . . . I will not add our [HBF] mark-up.  If he [*i.e., Cleveland Food Bank*] is interested, I will send it directly to you [*i.e.*, Gilman]."

60.    On March 17, 2017, Jones offered to show Gilman products at HBF's booth at a California conference for school summer feeding programs: "I don't mind [displaying Gilman products alongside HBF products]. The more products I have, the more people will come to my booth, so it is a win for me as well."

61.    On March 20, 2017, Hand replied, asking Jones to "consider allowing Gilman to pay you $.01 per bar . . . standard brokerage for all leads you send us . . . ."  Jones replied, without refusing Gilman's offer of brokerage fees, "I think I can help you best with the school segment so you don't waste a lot of time and money."

62.    Knowing that Gilman would pay her a brokerage fee, Jones emailed Hand on March 28, 2017, offering to "talk about your [Gilman's cheese] bars" at a camping industry trade show that she was "attending." It was or should have been obvious to Gilman that Jones'

attendance was to be at HBF's expense as HBF's representative. Jones never told HBF anything about displaying Gilman products at that trade show, as she well knew that HBF would not countenance such displays or be willing to have its sales representative promote to HBF's potential customers a cheese bar that was not an HBF product.

63.     Mr. Hand replied, by email on the same day, that he was "interested," and concluded, "[T]hanks for your help!" The next day, March 29, 2017, Jones replied, "Hopefully I can get some good sales for you."

64.     Jones' secret marketing to, and orders from, HBF's actual and potential customers for Gilman cheese bars were successful enough that on April 26, 2017, Gilman's CEO wrote to Jones to "apologize for our stock being so low. I did not anticipate a 4 pallet PO [purchase order] from you when I told you we keep this cheese in stock. Generally, we keep one or two pallets at a time."

65.     As set forth at Paragraph 55 above, Gilman sent Jones on April 30, 2017, a specific and explicit statement of their private arrangement for Jones to act as broker between Gilman and various HBF customers for sales that would otherwise have been those of HBF.

66.     On June 14, 2017, Jones wrote Hand asking him to build inventory dramatically "for summer feeding and for when school starts[.]" The feeding programs and school markets to which Jones referred were the very markets that HBF management had directed Jones to build for HBF. Further, her statement to Gilman's CEO was based on expertise that was developed at HBF's expense and intended to be applied only for HBF's benefit.

67.     Meanwhile, as detailed below, Jones also sought to divert to Gilman another long-time HBF customer, JA Foodservice, headed by Jackie Abbott, with the intention of brokering the Gilman-JA Foodservice relationship herself and excluding HBF from those transactions with that customer.

68.     In an email on April 28, 2017, sent from Jones' HBF email account and signed by her as HBF's "Director New Business Development," Jones provided Gilman with the completed credit application that HBF had received from JA Foodservice on March 2, 2016.

69.     In an email on June 7, 2017, again sent from Jones' HBF email account and signed by her as HBF's "Director New Business Development," Jones told Gilman's CEO concerning JA Foodservice: "I think this will be a nice account" for Gilman's direct-to-customer shipments.

70.     As described in the following paragraphs, Jones' secret marketing of Gilman cheese sticks to HBF's actual and potential customers also extended to the very large Feeding America market, which Jay Hersch described to Jones on August 14, 2017, as a "key market for you and HBF."

71.     The Feeding America program, one of the largest charities in the world, is a network of more than 200 food banks across the United States that together provide food products to more than 46,000,000 people annually.

72.     As described below, Jones sought to exploit this market for her private gain at HBF's expense, and she deceived HBF over many months in order to serve that private interest.

73.     Jones repeatedly conveyed to HBF management an inflexible view of market conditions that she claimed constrained or made unprofitable the sale of Gilman-manufactured, HBF-labeled cheese sticks into the Feeding America program.

74.     For example, in a business development email to Jay and Patricia Hersch dated September 13, 2016, Jones proposed to HBF prices for Gilman-made cheese sticks, and a way of meeting Feeding America's nutritional and other requirements, with the following comments:

> We tried to tap into the cheese stick market and gave it a very valiant attempt. Potential customers liked Gilman's cheese sticks and the many different flavors

that we could offer. But we crashed and burned – Gilman was way too expensive for our markets.  We were not even in the game unless we had no mark-up.

75.     HBF management explained to Jones that the company was extremely interested in selling into the Feeding America program, but that the pricing as presented would have to be modified.

76.     Jones in fact made no such modifications, but simply stopped exploring ways to have HBF sell Gilman-made cheese products into the Feeding America program either as a private labeler or as a distributor, and claimed to HBF management that alternative pricing was not possible.

77.     Nevertheless, HBF management decided it should promote certain of its other products at a Feeding America regional sales conference in Atlanta, Georgia, in summer 2017. HBF sent Defendant Jones to present HBF products at an exhibit booth at that conference, with all travel and exhibition expenses paid by HBF.

78.     HBF assigned and expected Jones to occupy and staff its booth at that conference solely and exclusively in HBF's interest.  As was Jones' usual practice, she traveled alone on this trip, unaccompanied by anyone else from HBF.

79.     However, without HBF's knowledge, authorization or consent, in HBF's booth at the Feeding America conference Jones prominently presented product(s) that were made by defendant Gilman and which bore the Gilman label.

80.     Jones also provided many or all of the HBF booth's visitors with a flyer that presented information only on Gilman-produced, Gilman-labeled cheese stick products.

81.     HBF had become a pre-approved vendor in the Feeding America program as of April 2016. Pre-approval of vendors provides members of the program with assurance of the vendors' reliability and creditworthiness. At the time of the 2017 Feeding America conference,

Gilman was not a pre-approved vendor in the Feeding America program.  Jones' secret showing of Gilman cheese sticks at HBF's booth during the Feeding America conference allowed Gilman to present the false appearance of pre-approved vendor status in violation of the Feeding America pre-approval protocols, and posed to HBF the risk of sanctions from Feeding America.

82.     Following the Atlanta conference, Jones sent numerous emails to existing and potential HBF customers as follow-up, again using her HBF email account and her title as HBF's "Director New Business Development." In these emails Jones discussed HBF price increases, and included a link to HBF's on-line catalogue, but also provided specifications and pricing information for Gilman cheese stick products, sometimes explicitly presenting herself as a Gilman representative. These post-conference emails were among the voluminous correspondence that Jones hid from her employer and tried to delete at or about the time of her departure from HBF.

83.     Also following the 2017 Feeding America conference, and also without the knowledge, authorization or consent of HBF, Jones arranged for samples of Gilman-labeled Gilman cheese sticks to be sent to contacts she had made or renewed at that conference at HBF's expense.

84.     Using her HBF email address, and signing her messages with her standard HBF title, "Director New Business Development," above multiple HBF trademarks, Jones sent information on Gilman products to these conference contacts, and otherwise communicated with them in her own and Gilman's economic interest and with the intent of excluding HBF from any resulting transactions.

85.     Jones thus secretly solicited business on behalf of Gilman from actual or potential HBF customers with whom she had developed relationships at the conference, while hiding from HBF the fact that she did anything other than represent HBF's interests there.

86.     For example, following the conference Jones secured an order for three pallets of Gilman cheese sticks from HBF customer Second Harvest Food Bank. This transaction, which circumvented her employer HBF, led Gilman CEO Hand to write her on September 7, 2017: "You are doing a fantastic job for us."

87.     The next day, September 8, 2017, Jones emailed Hand about the increasing volume of orders for Gilman cheese products. She wrote that JA Foodservice, the established HBF customer referred to in paragraphs 66-69 above, had just placed an order for 500 cases of Gilman cheese products that were not in HBF's product catalogue. She continued that "within 24 hours [I] broke my record [thumbs up emoji]." This led Hand to reply, that same day: "You are something!  Thanks again."

88.     Jones hid from HBF her communications with these existing and potential HBF customers about their interest in Gilman-labeled cheese products, just as she hid from HBF her communications with Gilman about Jones' private sales efforts. At no time before Jones left her job at HBF did HBF have reason to suspect that Jones secretly was marketing Gilman cheese sticks in the Feeding America program while she was HBF's employee, nor that her actions were undermining HBF sales efforts in the Feeding America program rather than advancing HBF's keen interest in growing its presence there.

89.     Jones' deceptions for the private gain of herself and Gilman also extended to potential opportunities to make sales into the Federal Emergency Management Agency ("FEMA") food program for hurricane relief in Puerto Rico in the fall of 2017.

90.     In an email on November 15, 2017, from Jones to M & J Foods, a distributor and an existing HBF customer, about truckloads of products that HBF was arranging to sell to FEMA for hurricane relief, Jones added the following note, without HBF's knowledge, authorization or consent -- but signed as HBF's "Director New Business Development" -- in an effort to promote cheese stick products made and sold directly by Gilman without HBF's involvement:  "My cheese manufacturer is now off of back log [sic] if you would like samples for any future possible needs.  I can also send you the samples of the sticks that were made - they really came out nice!  Let me know."  Jones' contact at M & J Foods replied that same day, accepting her offer to send samples of the products.

91.     In an email on May 22, 2017, sent from Jones' HBF email account while an HBF employee, and signed by her as HBF's "Director New Business Development," Jones wrote to the CEO of Gilman, thanking him for a reminder regarding a certain transaction: "What a great boss!"

92.     Many of the efforts described in paragraphs 52-90 above resulted in sales of Gilman-labeled Gilman cheese products to HBF's customer accounts, and to potential HBF customers, while and after Defendant Jones was an HBF employee. Both Gilman and Jones kept all such sales secret from HBF.

93.     For all or most such sales that Jones arranged for Gilman instead of for HBF, Jones received a commission from Gilman, and she hid both the commission and the underlying customer opportunities from HBF.

94.     By withholding all information about her private business development activities from HBF, Jones denied HBF any opportunity to benefit economically or reputationally from the outreach and sales efforts she undertook on Gilman's behalf for Gilman-labeled products while she was HBF's employee.

95. Jones' withholding from HBF of all information about her business development activities prevented HBF from discovering what she was doing and from attempting to put a stop to it.

96. Jones and Gilman acted in concert to interfere with HBF's business in competition with HBF, both while Jones was employed at HBF and afterward, knowing and intending that it would interfere with HBF's business relations and business expectancy.

### *Jones' Scheme with Western's Smokehouse, LLC*

97. While she was an employee of HBF, Jones secretly advanced the economic interests of defendant Western's Smokehouse, LLC ("Western's"), a supplier of shelf-stable meat products to HBF's private label, in a manner that interfered with HBF's existing business, its future business expectancy, and its business relationships.

98. Defendant Jones secretly became Western's' broker in a direct sales scheme while she was an HBF employee.

99. While and after she was HBF's employee, Jones provided Western's with her services to sell Western's meat products to food distributors and/or end users under the Western's label, hiding from HBF various customer opportunities that she offered directly to Western's.

100. Jones pursued business opportunities involving Western's for her own economic benefit, *i.e.,* for payment of commissions from Western's directly to her and, later, to her new company, Defendant NSN.

101. Both Jones and Western's stand to gain financially, and/or have gained financially, from this secret arrangement at HBF's expense.

102.    Western's and Jones secretly pursued and obtained business that rightfully belonged to HBF, Jones' employer, and thereby acted in concert to harm, and did harm, HBF's economic and reputational interests by causing HBF to lose existing and anticipated business, as well as reputational standing in the relevant field.

103.    While Jones was HBF's sales representative, she and Western's pursued at least two sales schemes intended to exclude HBF: (a) having Western's sell its meat products directly to a private labeler of pet treats, through Jones' private brokering and without involving HBF; and (b) developing a turkey stick product that Western's would sell directly into the Feeding America program, again through Jones' private brokering and without HBF's involvement. Both these schemes were conducted without HBF's knowledge, approval or consent, and were intended to, and did, cut HBF out of the transactions in question.

104.    In the first of the two schemes described in the preceding paragraph, beginning in October 2017, Jones sought to recruit for a private "side deal" a potential HBF customer, Bil-Jac Foods, Inc. ("Bil-Jac"), through Robert "Bob" Kelly, its President.  Mr. Kelly originally had contacted Jones as HBF's Director of New Business Development about the possibility that Bil-Jac would buy "pet treats" (*i.e.*, meat snacks for dogs) from HBF.

105.    Bil-Jac is a pet food product distributor and private labeler whose estimated annual revenues exceeded $23 million in 2016. Mr. Kelly is President of Bil-Jac.

106.    On October 27, 2017, Jones sent an email to Mr. Kelly from her HBF account, signed by her as HBF's "Director New Business Development," informing him that she had sent Bil-Jac samples she thought appropriate for the pet treats project. The samples were of products made by Western's and Old Wisconsin. She charged HBF $102.52 for the shipment, using an HBF United Parcel Service account that HBF did not use for shipments to existing customers. She did not inform anyone at HBF of this communication or of the shipment of

samples, did not document them in HBF's Salesforce software, and did not place Bil-Jac or Mr. Kelly in any HBF sales database.

107.    On October 30, 2017, Jones sent Kevin Western an email asking whether Western's could modify the recipe and packaging of its meat sticks and bars to meet the need of a "very large" customer who, she said, "has been in business since 1947" and "will be a new private label customer." Jones was referring to Bil-Jac, which was established in 1947.  She did not copy anyone at HBF on this message.

108.    On the morning of October 31, 2017, Jones sent to HBF's president and vice president, Jay and Patricia Hersch, the complete draft of an email she proposed to send to "Chuck and the gang" at Old Wisconsin, giving a sales pitch and detailed specifications that mirrored Bil-Jac's stated needs for pet treat sales, although the draft that Jones showed to the Hersches did not name Bil-Jac. Jones' proposed message mentioned that "this is not for people consumption[.]" Jones asked for approval to send her email to Old Wisconsin, saying, "[P]lease let me know that you think it is okay."

109.    Later that morning, HBF's Patricia Hersch responded to Jones, noting that since Old Wisconsin was already behind in delivering products that HBF had already ordered, HBF had decided that it was already taxing Old Wisconsin's capacity too much and would not be approaching Old Wisconsin at this time with requests about new products.

110.    The very next day, November 1, 2017, Jones sent a telling email to Mr. Kelly at Bil-Jac, titled "Great news," proposing to connect him directly with Western's without involving HBF at all, as follows:

> Happy Wednesday Morning Bob - I have some great news for you.  I have found the perfect family owned and operated manufacturer (second generation) for you.  We deal with two plants that make our products.  As I talked to both of them regarding this project this one is the best fit:

Western Smokehouse [sic]
Greentop, MO
Kevin Western, [Chief Operating Officer] COO will be contacting you
Thursday with ball park pricing on sticks and bars
660-949-2445
westerns-smokehouse.com

He is a dual license manufacturer for both human and pet consumption and
has had experience in dog treats. I provided him with the list of requirements[.]

111.    That same morning, Jones spoke with Kevin Western and then sent him an
email ("Per our conversation this morning") providing contact information for Bil-Jac,
"Owner: Bob Kelly."

112.    Eight days later, on November 9, 2017, Jones and Western's exchanged a series
of emails.  From her HBF email account ("Subject: Update"), signed by her as HBF's "Director
New Business Development" but without copying anyone at HBF, Jones asked Mr. Western:
"Hi Kevin - How did your conversation go with Bob?  You think any potential there?"
Approximately an hour later, again without copying anyone at HBF, Mr. Western replied to
Jones on her HBF email account:  "To be honest with you I have not called him yet. I am kind
of getting myself caught up and had planned on reaching out to him today."

113.    On November 16, 2017, Bil-Jac's president, Mr. Kelly, called Jones to say that the
immediate need and/or opportunity for a sale of pet treats had not materialized, and that Bil-
Jac was placing the project on hold until sometime in 2018.  Jones contacted Kevin Western,
who seemed pleased with the postponement. She assured him that she would "reach out" to
Bil-Jac in "mid-January" and follow up with Western's when Bil-Jac was "ready."

114.    On November 25, 2017, HBF's co-owner Patricia Hersch emailed Jones with
further thoughts about selling HBF-labeled meat snacks for pet consumption, and sent her
information on a potential supplier named Blue Dog Bakery. Ms. Hersch sent this information

to Jones as another opportunity, believing that the original opportunity with Bil-Jac was no longer available.

115.    Two days later, on November 27, 2017, Jones sent this same information to Mr. Kelly at Bil-Jac, with the self-serving (and false) introduction, "Thought you might be interested in what I found on Amazon." She then stressed: "Definitely need to move forward with the project in January.  I will be in touch." She signed the message with her standard HBF "Director New Business Development" signature block.  Her proposal for moving forward in January coincided with the timing of her resignation letter to HBF dated January 22, 2018.

116.    On November 29, 2017, Jones sent a noncommittal email reply to the message from HBF co-owner Patricia Hersch message about Blue Dog Bakery.  Jones suggested they "keep 'chewing' on this," and made no mention of her private contacts with Bil-Jac and Western's.

117.    In the second of the two schemes described in Paragraph 103 above, which overlapped in time with the first, Jones emailed Kevin Western on November 9, 2017 -- from her HBF email account, signed as usual as HBF's "Director New Business Development" -- about making a turkey snack stick, as follows:  "Do you currently for Western Smokehouse [sic] make any turkey 0.5 oz. snack stick?  The small pork stick is great but very limiting [in marketability] because it is pork.  Just wondering . . . . "

118.    At the time she sent this message, Jones knew that a 0.5-oz. turkey stick size, made in Western's "original flavor," would distinguish it slightly from the line of Western's meat snack sticks that Jones knew were profitable as sold by HBF under the Western's label, and more profitable than a Western's pork stick that HBF also sold.

119.    In other words, Jones was approaching Western's -- under color of her HBF position, but clearly in her private capacity and without informing HBF -- about making meat

sticks to compete with the line of meat sticks that HBF distributed under its private label and which Jones herself, as an HBF salesperson, had long marketed to actual and potential HBF customers, both in the school snack market and in the feeding program market.

120.    On the same day, November 9, 2017, Kevin Western replied to Jones: "We do make a [0].5 oz stick but not in our [Western's original] flavor. **I would look at doing that if you think there would be opportunity."** (Emphasis supplied.)  Jones then asked Kevin Western for prices, either "delivered" or "FOB," meaning with or without including charges for shipping from Western's' plant to the customer.  Jones enticed Western's with the following estimate of potential sales based on market knowledge she had developed at HBF's expense during her years as HBF's employee:

> What would be the price of a 0.5 [oz.] turkey original flavor?  After I have pricing I can let you know but **if right it would grow into $1M [$1,000,000] in sales in a course of a year.  Give me FOB and Delivered** [pricing].  **I would like to test it in the same conversation with the same people I am testing the larger** [HBF] **stick with** [*i.e.,* Jones planned to reach out, on Western's behalf, to HBF accounts and potential HBF customers with whom Jones was in communication for HBF snack sticks from its own product catalogue].  Thank you.  [signed] Lisa D. Jones Director New Business Development"  (Emphasis supplied.)

121.    In this message, Jones in effect was advising Western's' -- under color of her HBF position, but in her private capacity, without informing HBF, and intending to benefit herself and Western's at HBF's expense -- that if Western's were to produce 0.5-oz. turkey sticks that would compete with HBF-catalogue products, and if Western's sold these sticks through Jones' own private brokering (*i.e.*, not through HBF) in Western's own "original flavor" bearing the Western's label, then the market Jones would open up to Western's would "grow into $1M [million] in sales" for Western's within a year if product pricing was right.

122.   The emails of November 9, 2017, as described in paragraphs 117-121 above, demonstrate that Jones wanted Western's to price the turkey stick product lower than the prices listed in HBF's catalogue for meat snack products. In other words, Jones was deliberately undercutting her employer with a product from one of its own suppliers, and turning Western's from an HBF-supplier into HBF's competitor.

123.   Mr. Western quickly replied to Jones later that day, November 9, 2017:

> I do not think I could give a delivered price without knowing quantities and destination.  We are currently selling the pork stick for $60.48/case or $.21 each and you pay for the shipping.  **I could go $66.24/case or $.23 each for the turkey stick and you pay for the shipping.  Not sure how that lines up with what you are doing.**  It would take me a couple of months to get set up with film and ready to produce.  Let me know your thoughts? (Emphasis supplied.)

124.   In reply to the email from Kevin Western quoted in the preceding paragraph, Jones quickly wrote back on November 9, 2017, that she now had the information she needed to "talk to my peeps," meaning HBF customer accounts and potential HBF customers that she wanted to convert into Western's customers:  "Sounds great - I have enough info now to talk to my peeps [thumbs-up emoji]. Minimum shipment is a pallet. Lisa."

125.   Mr. Western asked: "I think that [a pallet] would be a good minimum?", and Jones replied, still on November 9, 2017: "Yes, these customers [*i.e.,* HBF's customers, based on her experience with them] only buy by the pallet plus. Lisa."  Jones thus supplied Western's with still more information she had learned solely in her capacity as an HBF employee.

126.   In addition to the two schemes described in Paragraph 103 above, Jones arranged during November 2017 for large quantities of Western's' meat product(s) to be sold into the FEMA food relief program in the wake of the Puerto Rico hurricane.

127.    To provide Western's with this sales avenue at that time, Jones needed to involve HBF because, unlike Western's, HBF was already an approved vendor in the FEMA food program.

128.    Therefore, Jones arranged for a FEMA food program distributor to place a large order that would be filled using Western's meat sticks in HBF private-labeled bags. In a reply email sent to Jones' email account at HBF on November 20, 2017, Western's COO Kevin Western told Jones, regarding an order that Western's shipped out for the FEMA program some nine days later: "**I am going to line your pockets a little bit more for the last order. No one will have to know about it!**" (Emphasis supplied.)

129.    Jones replied just four minutes later by email to the Western's COO -- again sent from her HBF account and signed as HBF's "Director New Business Development," and again in a message she tried to delete before leaving HBF's employ:

> "You really don't have to and you are way too kind.  Some day we will have to meet.  **I am thrilled that I have been able to find business to throw your way and I will continue to be on the hunt.**"                     (Emphasis supplied.)

130.    Defendant Jones' scheming with Western's with regard to the Puerto Rico FEMA transactions also included at least one secret transaction with distributor M & J Foods, the same firm described in Paragraph 90 above.

131.    On November 15, 2017, Jones sent Mike Zimmer at M & J Foods a purchase order (No. 112017) for 0.75-oz. turkey sticks. The vendor on that purchase order was listed as Western's Smokehouse, not HBF. Jones then sent M & J Foods electronic funds transfer information for Western's Smokehouse. At the same time, Jones sent Western's her own personal IRS W-9 form, confirming her arrangement for direct payment of fees or commissions to her for at least part of this order without involving HBF.

132.    On November 20, 2017, Jones secretly wrote to Kevin Western, splitting the just-described order for Western's-produced meat snacks into two separate purchase orders, one from HBF and one from M & J Foods:

> "Hi Kevin - Awesome!!!  Thanks for being patient and jumping through hoops [smiley face emoji].  I just gave all the info to Leslie for her to cut you a PO for the 2 truckloads [of meat snack products].  I will be getting a separate PO from MJ [M & J] Foods made out right to you for the 3 pallets and that will have all the invoicing info.  Once you create the invoice send it to me and I will have them ACH payment to you upon delivery.  My address:  Lisa Jones[/]25186 Ship Square[/]Chantilly, VA 20195.  Thanks again Kevin.  Lisa D. Jones Director New Business Development ...."

133.    The secret scheme just described was placed at risk of partial discovery by HBF when Western's billed HBF directly, rather than M & J Foods, for the transaction described in the preceding paragraph. Jones contacted Western's to say that Western's' statement was incorrect in naming HBF as the billed party. In addition, in an effort to ensure that no other billing records showed a similar inadvertence, Jones asked her contact at Western's to send directly to her, Jones, statements of accounts receivable, *i.e.*, bills, that Western's had sent HBF from November 1, 2017 through the "current" date (*i.e.*, Dec. 22, 2017). This stratagem allowed Jones to avoid asking HBF's finance personnel for the records, and to avoid arousing HBF's suspicion concerning any similar mistakes that might have appeared.

134.    Jones tried to delete all of these emails shortly before her departure from HBF, without ever revealing their contents to her employer, just as she tried to do with many other emails that showed her circumvention of and disloyalty to HBF.

135.    In January 2018, Jones suggested to HBF that she be approved to visit Western's, ostensibly to look at other products that Western's might have available to sell to the feeding programs market. HBF co-owners Jay and Patricia Hersch decided that one of them should

accompany Jones on any such trip, and so informed her.  Jones immediately demurred, saying the trip should be put off to spring 2018 when the weather was better.

136.   On information and belief, Western's and Jones concerted together in the unfair competition described herein, without limitation, both while Jones was employed at HBF and afterward, knowing and intending that their activities would interfere with HBF's business relations and business expectancy as to both existing and potential HBF customers.

### Jones' Own Description of Her Schemes with Gilman and Western's

137.   Early on the morning of January 2, 2018, the first business day of the new year and several weeks before she sent HBF her letter of resignation, Jones emailed Cynthia Gosselin, HBF's contact at Jenmax Foods, the HBF customer described in Paragraph 58 above. In this email, titled "New Meat Stick," sent from her private address, lisa@ntlsupplynet.com, and signed simply "Lisa Jones, Business Development, 716-525-2537 (cell)," with no firm name or other identifying information, Jones announced and described her "on the side" private brokering for Gilman and Western's, and her intent to leave HBF's employ having established those private arrangements, as follows:

> This is my new email address. I will be working for two new manufacturers (Gilman Cheese and Western Smokehouse) on the side right now and full time starting at the end of January – I will be giving my notice sometime near the end of this month.

138.   Jones continued this email by giving Jenmax advance notice of a price increase for HBF products, and explicitly offering to undercut those prices for her own sales of virtually identical products from the same suppliers, as follows:

> Starting February 15th Highland Beef Farms will be having a price increase (you will get the email shortly under my Highland Beef Farms email).  The 0.5 oz. meat sticks are going up to $0.32-$0.34 a stick.  However, I am pleased to

announce that I have developed an awesome 0.5 oz. original turkey stick with Western Smokehouse and the price is $0.27 delivered!!!

139.   This email establishes that Jones made the private arrangements with Gilman and Western's that are alleged in this Complaint; that the three Defendants made these arrangements knowingly and willfully; and that the arrangements were intended to exclude HBF from revenue-producing transactions, and to benefit Jones and her co-Defendants financially at HBF's expense.

*Select Summary of HBF's Revenue Losses Due to Defendants' Acts*

140.   The complained-of activities of Jones, Gilman, and Western's, jointly and severally, have resulted in at least, and without limitation, the following losses of revenue to HBF:

a.   Sales of $72,604.80 to Champion FoodService, of Bucyrus, Ohio, per purchase or sales orders dated August, 22, 2017; September 11, 2017; and November 10, 2017.

b.   Sales of approximately $3,200 to Commercial Food Systems, Inc., of Indianapolis, Indiana, per purchase order dated January 2, 2018.

c.   Sales of not less than $4,320 to Eastern Illinois Foodbank, of Urbana, Illinois, mentioning purchase order No. #GAVIN08302017, dated August 30, for one pallet of Gilman cheese bars, precise price unstated.

d.   Sales of $17,280 to Feeding America West Michigan, of Comstock Park, Michigan, per purchase orders dated August 22, 2017, and September 26, 2017 (same quantity and price as (e) below).

e.  Sales of $17,280 to The Food Exchange, of Carlsbad, Calif., per purchase orders dated July 27, 2017; September 21, 2017; and October 25, 2017 (same quantity and price as (d) above).

f.  Sales of $34,084.80 to FreeStore Food Bank, of Cincinnati, Ohio, per purchase orders with dates from June 30, 2017, and January 26, 2018.

g.  Sales of $4,169.50 to Global Foods, Inc., of Las Vegas, Nevada, per purchase order dated May 12, 2017.

h.  Sales of not less than $43,200 to Good Source Solutions, Inc., of Carlsbad, Calif., per email discussions between Lisa Jones and Good Source Solutions, Inc. (Bob Rump and Julie Uribe).

i.  Sales of $14,860.80 to Greater Cleveland Food Bank, of Cleveland, Ohio, per purchase orders dated May 17, 2017; May 22, 2017; and May 29, 2017.

j.  Sales of $111,620.50 to JA Food Service, of Buchanan, Michigan, per 11 purchase or sales orders dated between April 25, 2017, and January 18, 2018.

k.  Sales of $9,555.84 to M & J Foods, Inc., of Ocala, Florida, per purchase order dated November 20, 2017.

l.  Sales of not less than $4,320 to Revolution Foods, of Oakland, Calif., per email discussion between Caitlin Yip and Lisa Jones, December 20, 2017.

m.  Sales of $64,800 to Second Harvest Food Bank of Middle Tennessee, of Nashville, Tennessee, per purchase orders dated September 7, 2017; October 12, 2017; and December 18, 2017.

n.  Sales of $4,008 to UMC Food Ministry, of Latonia, Kentucky, per purchase order dated December 8, 2017

o.  Revenues that would have flowed to HBF from all transactions that Jones

closed for any entity other than HBF after her HBF employment ended, for any

customer identified during her HBF employment.

p.  Revenues from loss or impairment of HBF's business relationships, present and

future market share, and business reputation for probity and reliability with the

foregoing customers and with all others with whom Defendant Jones had

deceitful or self-dealing interactions.


## COUNT I:
### *Jones' Breach of Contract under Virginia Common Law*

141.   The preceding allegations of this Complaint are incorporated herein in their

entirety by reference.

142.   The confidentiality, non-disclosure and non-use agreement ("CNDNU" or

"CNDNU Agreement") referred to in Paragraphs 18-23 of this Complaint was part of the

contractual employment agreement between HBF and Jones.

143.   At CNDNU paragraph 1.a, the list of examples of "Confidential Information"

not to be disclosed or used includes:  HBF's customer lists, pricing policies, recipes, sales

information, payment terms and terms of sale, marketing knowledge and/or information,

production knowledge or information, information on potential business acquisitions or

opportunities, financial information, vendor pricing, prospective trademarks and other trade

secrets. The CNDNU Agreement further clarified HBF's "Confidential Information" as

including:

> all information of any kind regarding . . . [HBF's] vendors [or] customers . . . that
> Employee learns. . . not generally available to the public, and . . .  the disclosure
> of which has the potential to harm [HBF] or its business and/or assist [HBF's]
> competitors.

144.    "Nondisclosure and Nonuse" restrictions in the CNDNU Agreement (paragraph 1.b), to which Jones specifically agreed:

> Nondisclosure and Nonuse Agreement.  Employee agrees to restrict disclosure of Confidential Information . . . to those disclosures that are necessary and appropriate for the performance of Employee's assigned job duties for the COMPANY and that are made solely for the benefit of the COMPANY.  In addition, Employee covenants not to use Confidential Information in any way to the detriment of the Company . . . even if that Confidential Information is not disclosed to any Third Parties.

145.    The CNDNU Agreement expressly and specifically stated that employment is "contingent on Employee's commitment to abide by the terms set forth in this Agreement and that [HBF] would not hire or continue to employ Employee, without Employee's acceptance of the terms of this [CNDNU] Agreement.

146.    By signing the CNDNU Agreement on or around Sept. 4, 2015, Jones legally acknowledged that she was on notice of each of its requirements from at least that time forward throughout the tenure of her employment at HBF, and agreed to comply with all requirements the Agreement contained, including its restrictions on her use of "Confidential Information" through its "Nondisclosure and Nonuse Agreement."

147.    Jones' disclosures of confidential HBF information to Gilman and Western's, as well as her disclosure of confidential HBF information to actual and potential customers of HBF, were in breach of these core provisions of the CNDNU.

148.    On or about August 27, 2013, Jones acknowledged her receipt and acceptance of the HBF Employee Handbook, by signing and dating a one-page acknowledgment document that read in pertinent part as follows: "I have received the handbook, and I understand that it is my responsibility to read and comply with the policies contained in this handbook and any revisions made to it."

149.    The requirements of loyalty and avoidance of conflicts of interest, as set forth in HBF's Employee Handbook and described in paragraphs 24-28 of this Complaint, were conditions of Jones' employment at HBF and were consistent with terms in the CNDNU Agreement described above.

150.    In signing the acknowledgment described above, Jones expressly and voluntarily recognized, accepted and undertook the obligation to comply with all Employee Handbook requirements, as well as all terms of the CNDNU Agreement.

151.    The CNDNU and Employee Handbook provisions were in effect when Jones engaged in actions that were impermissible under one or both, including the following:

   a.   actions disloyal to HBF;

   b.   actions in service of interest(s) that conflicted with the interest(s) of HBF;

   c.   unauthorized disclosures of confidential HBF information to HBF's competitors and to its actual and/or potential customers; and

   d.   unauthorized use of confidential HBF information to circumvent HBF, to harm HBF's business and/or assist HBF's competitors.

152.    By committing the impermissible acts referenced in this Complaint, Jones breached her contract of employment with HBF.

153.    Jones' breach of her HBF employment contract has led to harms to HBF that were economically foreseeable as detailed in this Complaint, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

154.   Jones' breach of her HBF employment contract has resulted in the irreparable harms to HBF specified in Paragraph 2 of the CNDNU, and entitles HBF to the full range of injunctive and equitable relief that this Court has power to grant.

155.   Jones' acts alleged in this Complaint and in this Count I were deliberate, willful and intentional, and warrant the imposition of punitive damages.

## COUNT II:
### *Jones' Breach of Tort Duty of Loyalty under Virginia Common Law*

156.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

157.   Defendant Jones owed HBF a duty of loyalty by virtue of her status as an HBF employee.

158.   Jones's position of trust as a sales representative of HBF, and as HBF's director of new business development, made her a fiduciary of HBF and imposed on her the exacting fiduciary duty of loyalty that is recognized under Virginia common law.

159.   Jones' duty of loyalty to HBF, as a fiduciary and/or as an employee, required her to hold HBF's interests superior to her own interests and/or to those of any other person or entity in commerce with HBF.

160.   Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by misusing HBF's confidential information, including by secretly providing confidential HBF information regarding its customer base to Gilman and Western's.

161.   Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by misappropriating other HBF trade secret information and resources. Examples of HBF resources that Jones misused to commit wrongs set forth in this

Complaint include HBF's payment of Jones' salary, travel and convention booth rental expenses, which Jones misused for the benefit of herself and Gilman, at HBF's expense.

162.   Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by cultivating for her own personal gain, and that of direct or indirect upstream suppliers to HBF, the business relationships that she had been sent and instructed, and had a duty, to establish or expand into various market sectors for HBF's own economic benefit.

163.   By offering samples and information regarding Gilman products directly to HBF's customers on Gilman's behalf and by soliciting existing and potential HBF customers on behalf of a supplier other than HBF, without HBF's knowledge or authorization, Jones harmed HBF and breached her Virginia common law duty of loyalty to HBF as a fiduciary and/or as an employee.

164.   By excluding HBF from transactions that she had a duty to conduct for the economic and reputational benefit of HBF, and by arranging those transactions to benefit herself through private brokerage fees and/or commissions, Jones damaged HBF's existing business relationships with Gilman and Western's, subordinated HBF's interests to her own, and breached her Virginia common law duty of loyalty to HBF as a fiduciary and/or as an employee.

165.   Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by concealing from HBF information regarding the contacts and potential customers she was developing, through use of HBF resources and information, for the benefit of defendants Gilman and Western's instead of for the benefit of HBF.

166.   Defendant Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by misappropriating valuable information on

existing accounts and downstream customers of HBF for her own economic and reputational benefit, and for the benefit of defendants Gilman and Western's respectively, instead of for the benefit of her employer HBF.

167.    Defendant Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by subordinating HBF's interests to those of a competitor of HBF, defendant Gilman.

168.    Defendant Jones breached her duty of loyalty to HBF under Virginia common law, as a fiduciary and/or as an employee, by subordinating HBF's interests to those of a competitor of HBF, defendant Western's.

169.    The acts of defendant Jones alleged in this Complaint and in this Count II caused damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

170.    The acts alleged in this Complaint and in this Count II were deliberate, willful and intentional, and warrant the imposition of punitive damages.

### COUNT III:
*Jones' Tortious Interference with HBF's Existing Contract, Business Expectancy or Prospective Business Relations*

171.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

172.    As a food distributor and private label food supplier, HBF has contractual relationships or business expectancies with:

a.    Food product manufacturers, "upstream" from HBF in the chain of commerce, that transact business and/or communicate with HBF regarding matters such as

financial information, recipes, ingredients, food formulas, nutritional contents, weights and quantities to be produced, labeling requirements, and packaging requirements, according to requests from HBF's own "downstream" customers who through purchase orders buy food products that HBF private labels or otherwise distributes; and

b. Food product distributors and end users, downstream from HBF in the production and distribution chain, with which HBF has and develops accounts that HBF services, for its economic benefit, in efforts to fulfill purchase orders for food products which HBF arranges to have produced to the customer's needs (*i.e.,* by private labeling or otherwise distributing).

173.   Defendant Jones, as HBF's then-director of new business development, knew of HBF's contractual relationships and business expectancy in a wide range of areas.

174.   For example, Jones periodically received instructions and other input from HBF management regarding business development efforts, and she was privy to discussions about these matters during the years when she worked at HBF's office in Reston, Virginia.

175.   HBF's business development efforts while Jones worked there included both (a) new market areas that HBF management identified as potentially economically beneficial to HBF, and (b) existing market areas (*e.g.*, various food programs and end-user categories such as schools, prisons, food banks, etc.) that HBF management was targeting for additional revenue growth.

176.   At relevant times and without limitation, HBF management instructed Jones to develop an understanding of new market sectors (*i.e.*, new to HBF), as well as new directions in market sectors in which HBF already was involved; to identify new business opportunities in each such market sector, and to develop the identified business opportunities; and to report

regularly to HBF with details regarding her efforts, including by entry of customer details in HBF's Salesforce customer relations management software account.

177.    Jones knew that HBF, as a company with decades of expertise and experience in the food distribution market sector, had a business expectancy in respect of both existing and prospective business relations in order (a) to expand its enterprise into the new market areas so that its prospective business relations could be converted into purchase orders from both existing and prospective customers, and (b) to grow HBF's then-existing business within market sectors in which HBF already operated (*e.g.*, the Feeding America program and contracts to supply distributors selling into FEMA aid programs), and thereby to convert its prospective business relations into purchase orders from existing and prospective customers.

178.    While Jones was employed as HBF's director of new business development, she conducted frequent and extensive correspondence, including a large number of emails which she hid from HBF while she was an HBF employee and attempted to delete at or around the time of her departure, that intentionally and improperly interfered with HBF's prospective and existing contractual relations, business relationships and business expectancy.

179.    Jones' actions in doing so caused or induced a breach or termination of HBF's contractual relationships and business expectancy, and a loss of the benefits of HBF's business relations.

180.    Jones' improper actions included inducing or otherwise causing third parties not to enter into or continue business relations with HBF as a private labeler and/or distributor of products made by Western's and potentially by other upstream producers. Jones' improper actions further included efforts by her and/or her corporate persona NSN, LLC, to convert actual and prospective customers of HBF into customers of Western's, with

commissions or fees to her or NSN, deliberately cutting HBF out of the distribution chain and harming HBF's economic and reputational interests.

181.    Jones' improper actions included converting actual and prospective customers of HBF into customers of Gilman's own Gilman-labeled food products, deliberately cutting HBF out of the distribution chain and harming HBF's economic and reputational interests.

182.    Jones improperly and impermissibly misused confidential information belonging to HBF as part of her effort to deprive HBF of business from its current or potential customers, and to enrich herself (personally and/or through her corporate persona NSN) and Gilman or Western's, respectively.

183.    Jones intentionally arranged for herself (or her corporate persona NSN), and Gilman and/or Western's, to benefit economically and reputationally from transactions with actual and potential downstream customers of HBF that excluded HBF entirely, even though as a salaried full-time employee of HBF Ms. Jones was expected, and paid, to work for her employer's benefit and build rather than sabotage HBF's business.

184.    Jones used improper methods or means (*e.g.*, her repeated acts of concealment and deception), to interfere with HBF's contractual relationships and business expectancy.

185.    Jones' actions prevented HBF from acquiring or continuing various prospective business relations in a manner that prevented the making of purchase orders (or reduced the likelihood of doing so in the future) for food products that HBF currently offered, or prospectively would have offered, as a private labeler or food distributor.

186.    Jones' actions in doing so, and at various times the actions of her corporate persona NSN, resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business

reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

187.    Because Jones (personally and/or through her corporate persona NSN) acted intentionally, purposely and without lawful justification, HBF is also entitled to punitive damages from her.

## COUNT IV:

### *Gilman's Tortious Interference with HBF's Existing Contract, Business Expectancy or Prospective Business Relations*

188.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

189.    Defendant Gilman knew of HBF's business as a private labeler and/or distributor of food products that were sold in various sectors of the marketplace.

190.    Defendant Gilman knew of HBF's business expectancy of expanding its revenue base in existing market sectors in which HBF was operating while and after Jones was HBF's employee.

191.    Gilman knew of HBF's business expectancy with regard to expansion of its revenue base by entering, while and after Jones was HBF's salaried, full-time employee, into new market sectors for food products that HBF believed it could service.

192.    Gilman knew that HBF's business involved Gilman both as a potential supplier of cheese products directly to HBF and as an existing supplier of cheese products to Old Wisconsin Sausage Co., a producer and packager which provides meat-and-cheese combination products to HBF for private labeling, at HBF's instruction, for sale to HBF's existing and potential customers.

193.   Gilman knew that it had been introduced to Jones by HBF as HBF's representative. Gilman further knew that HBF wanted her to develop an understanding of new and existing market sectors for HBF, and to work with Gilman on HBF's behalf in service of HBF's efforts (a) to enter new market sectors, (b) to expand existing market sectors in which HBF already operated, and (c) to develop logistics for an HBF-Gilman interaction, *e.g.,* unit sizes, shipping quantities and delivery times, for HBF accounts.

194.   Gilman knew that at a regional food conference in Atlanta in summer 2017, Jones displayed -- in a booth rented by HBF, which Jones staffed as HBF's director of new business development -- samples of Gilman's cheese stick products, with Gilman's own labels thereon identifying them as Gilman-made (and without any identification of HBF).

195.   Gilman knew that Jones was following up with contacts she made or renewed at that regional food conference by sending those contacts (a) an invitation to receive samples of Gilman's cheese sticks directly from Gilman, and/or (b) a Gilman flyer describing Gilman's Gilman-labeled cheese stick products and Gilman's own pricing information.

196.   Gilman further knew that Jones was also contacting existing customers of HBF, in order to explore their interest in sampling Gilman-labeled cheese products and potentially purchasing them from Gilman directly, and was gathering information on Gilman's behalf regarding the prospective customers' logistical needs.

197.   Gilman knew that Jones was providing these services to Gilman without HBF's knowledge, consent or approval.

198.   Gilman paid commissions, either to Jones personally or to her corporate persona NSN, for completed sales of Gilman products that bypassed HBF and excluded it from the distribution chain.

199. Gilman, through actions and correspondence, intentionally and improperly interfered with HBF's prospective and existing contractual relations, business relationships and business expectancy.

200. Gilman's actions in doing so caused or induced a breach, termination and/or diminution of HBF's contractual relationships and business expectancy, and a loss of the benefits of HBF's business relations.

201. Gilman's improper actions interfered with HBF's business expectancy and prospective business relations in a manner that prevented and materially interfered with HBF's ability to secure purchase orders from existing or potential HBF customers (and reduced HBF's likelihood of doing so in the future) for food products that HBF currently or prospectively was arranging to offer as a private labeler or food distributor.

202. Gilman took and used confidential information belonging to HBF as part of its effort to solicit HBF's current or potential customers for Gilman's own economic benefit.

203. Gilman used improper methods or means to interfere (a) with HBF's contractual relationships and business expectancy, and (b) with HBF's employment contract with Jones.

204. Gilman's interfered by employing improper methods that materially contributed to Jones' breaches of her fiduciary relationship to HBF, of her duty of loyalty and fidelity to HBF, and of her contractual relations with HBF while she was HBF's employee.

205. Gilman's actions resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

206.   Because Gilman acted intentionally, purposely and without lawful justification, its conduct warrants the imposition of punitive damages.

## COUNT V:

*Western's Tortious Interference with HBF's Existing Contract, Business Expectancy or Prospective Business Relations*

207.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

208.   Western's knew at relevant times that HBF had a contractual relation with its then-employee Jones, under which HBF paid Jones commissions for purchase orders that HBF customer(s) placed for food products which HBF directly or indirectly supplied.

209.   Western's further knew that HBF did so through a process that involved, at relevant times, Western's as an upstream supplier of meat products to the private labeler and/or food distributor HBF.

210.   Defendant Western's knew of HBF's business as a private labeler or distributor of food products, and knew that HBF sold into various sectors of the food products marketplace.

211.   Western's knew that Jones, while she was HBF's Director of New Business Development, was contacting various customers of HBF to determine their interest in placing purchase orders directly with Western's (*i.e.*, excluding HBF) for food products made by Western's that were similar in flavor, unit weight, and/or nutritional content to products that HBF was then distributing, thus opening a rival channel for Western's products as an alternative to distribution through HBF and in competition with HBF.

212.   Western's knew that Jones was providing these services to Western's without HBF's knowledge, consent or approval.

213.    Defendant Western's knew of HBF's business expectancy of expanding its revenue base in existing market sectors in which HBF was operating while Defendant Jones was HBF's Director of New Business Development.

214.    Defendant Western's knew that HBF wanted to expand its revenue base by entering into new market sectors for food products that HBF believed it could service as a private labeler and/or food distributor through purchase orders made by prospective distributors and other end users.

215.    Defendant Western's knew that HBF made Jones available to interact with Western's as HBF's representative, charged by HBF to develop an understanding of new and existing market sectors for HBF, and to work with Western's on HBF's behalf, in service of HBF's efforts to enter new market sectors and to expand existing market sectors in which HBF already operated.

216.    Defendant Western's, through verbal actions and correspondence in concert with Jones, intentionally and improperly interfered with HBF's prospective and existing contractual relations, business relationships and business expectancy.

217.    Western's' actions, as described in this Complaint and in this Count V, caused or induced a breach or termination of HBF's contractual relationships and business expectancy, and a loss of the benefits of HBF's business relations.

218.    Defendant Western's' tortious interference included inducing or otherwise causing third parties not to enter into or continue business relations with HBF regarding food products made by Western's, and potentially of products made by other food producers in coordination with HBF as a private labeler or food distributor.

219.   Western's took and used confidential information belonging to HBF as part of its effort, through and in concert with Jones, to solicit HBF's current or potential customers for Western's' own economic benefit.

220.   Defendant Western's' improper acts prevented or materially interfered with HBF's efforts to acquire and continue or expand various prospective business relations by limiting or preventing HBF's ability, as a private labeler or food distributor, from HBF's current and potential customers.

221.   Defendant Western's used improper methods or means, including but not limited to a pattern of deception and concealment, to interfere with HBF's contractual relationships and business expectancy, and with HBF's employment contract with Jones.

222.   Western's interfered by employing improper methods that materially contributed to Jones' breaches of her fiduciary relationship to HBF, of her duty of loyalty and fidelity to HBF, and of her contractual relations with HBF while she was HBF's Director of New Business Development.

223.   Western's' actions, as described in this Complaint and in this Count V, resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

224.   Because Western's acted intentionally, purposely and without lawful justification, its conduct warrants the imposition of punitive damages.

## COUNT VI:
### *Jones' Violations of Virginia Uniform Trade Secrets Act*

225.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

226.    Defendant Jones had access to a wide array of information residing in HBF's written and computer records that (a) had economic value, (b) was not generally known or easily assembled, (c) was key to HBF's business success, (d) was gathered by dint of substantial effort over many years, and (e) was available for use only by HBF employees and only for HBF's business purposes.

227.    Such information included data on HBF's existing and/or potential downstream customers, such as:  key personnel names; corporate addresses, email addresses and telephone numbers; customers' buying history or requests, including without limitation food flavor, food type, item size or weight, and product volume histories; customers' requests for food product formula, ingredient and nutritional modifications on a product-by-product basis; customers' pricing sensitivity; aggregate sales to each customer at specific price points; customers' shipping and delivery requests; customers' financial condition and creditworthiness; and customers' business relationships.

228.    Such information also included data on food product manufacturers, including HBF's current and potential future suppliers, such as: key personnel names; corporate addresses, email addresses and other not generally available contact information; information on pricing and price flexibility; product flavor options, weight, and packaging; ingredients, recipes and nutritional information on products produced or inquired about by HBF; food production methods, including quantity and production schedule capabilities; and information pertaining to HBF's commercial relations with other entities in the food production sector.

229.    Such information included information that Jones obtained in her capacity as HBF's Director of New Business Development, and that therefore belonged exclusively to HBF.

230.    HBF continually made reasonable efforts to maintain the secrecy of all such information it acquired and assembled, including: (a) having its employees sign a confidentiality, non-disclosure and non-use agreement; (b) having employees acknowledge in writing their receipt of HBF's Employee Handbook, which set forth HBF policies regarding, among other things, maintaining the confidentiality of HBF data and adhering to standards of ethical conduct; and (c) restricting to HBF employees access to HBF's computer databases and other media containing such information.

231.    All such information and data were trade secrets of HBF, and as such were protected under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336 *et seq.*

232.    Jones knowingly disclosed HBF trade secret information to Gilman, Western's and other third parties without HBF's express or implied consent. At the time of such disclosure, Jones knew or should have known that her knowledge of HBF trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

233.    Defendant Jones knew that such information had economic value and was not generally known or easily assembled.

234.    Jones knew that such information was of the type that HBF customarily keeps secret from all persons outside the firm and acquires in furtherance of its business purposes, including private labeling, food distribution, business growth, development of new markets, market share increases, and profit.

235.    In acting as alleged in this Count VI, Jones violated the Virginia Trade Secrets Act, Va. Code § 59.1-336 *et seq.*

236.    Jones' violations of the Virginia Trade Secrets Act resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales,

loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

237.    Because Jones' misappropriation as described in this Complaint and in this Count VI was willful and malicious, HBF is entitled to recover treble damages, or punitive damages of up to twice actual damages, under Va. Code § 59.1-338(B), plus attorneys' fees under Va. Code § 59.1-337.

238.    Because any such damages, and any other remedy at law, will not suffice to rectify or cure Jones' past violations, or deter or prevent her future violations, of the Virginia Uniform Trade Secrets Act, this Court may enjoin any and all misappropriation of protected trade secret information under Va. Code § 59.1-337.

## COUNT VII:
### *Gilman's Violations of Virginia Uniform Trade Secrets Act*

239.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

240.    In its dealings with Jones for its own economic benefit, Gilman knew that Jones was an HBF employee with the title and duties of Director of New Business Development.

241.    Accordingly, Gilman knew or should have known that information it received from Jones while she was an HBF employee was information belonging to HBF that Jones obtained in her capacity as an HBF employee.

242.    Gilman knew or should have known that information it was receiving from Jones had economic value to HBF and was not generally known or easily assembled.

243.    Gilman knew or should have known that the information it was receiving from Jones included non-public information belonging to HBF concerning actual or potential HBF

customers, product marketing strategy, and/or specific markets or programs within the food purchasing and distribution sector.

244.    Such information included any or all of the following, without limitation: key personnel names; corporate addresses, email addresses and telephone numbers; customers' buying history or requests, including but not limited to food flavor, food type, ingredients, production formula, nutritional requirements, item size or weight, and packaging and product volume histories; customers' pricing sensitivity; aggregate sales potential to particular customers at specific price points; customers' shipping and delivery requests; customers' financial condition and/or creditworthiness; and customers' business relationships.

245.    Gilman knew or should have known, from its familiarity with prevailing industry standards, norms, customs and practices, that HBF made reasonable efforts to have its employees maintain the secrecy of HBF's trade secret information.

246.    Gilman knew or should have known that Jones, while she was an employee of HBF, was presenting information to Gilman which, under prevailing industry standards, norms, customs and practices, was for access and use exclusively by HBF.

247.    Gilman knew or should have known that Jones, while she was an employee of HBF, had obtained the information described in the preceding paragraphs by improper means and/or conveyed it to Gilman by improper means.

248.    Gilman knew or should have known, based on the foregoing, that information it was obtaining from Jones was protected HBF trade secret information.

249.    Gilman knew or should have known that Jones was providing Gilman with this trade secret information without HBF's express or implied consent.

250.    At times when Jones was disclosing HBF trade secret information to Gilman, Gilman knew or should have known that its knowledge of the HBF trade secrets was derived

from or through Jones, who owed HBF a duty to maintain its secrecy and/or to limit its use to purposes benefiting HBF.

251.    Gilman rewarded Jones with an economic benefit to her personally, *i.e.,* brokerage fees and/or commissions, for disclosing HBF trade secret information as alleged herein.

252.    In acting as alleged in this Count VII, Gilman violated the Virginia Trade Secrets Act, Va. Code § 59.1-336 *et seq.*

253.    Gilman's violations of the Virginia Trade Secrets Act as alleged in this Count VII resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

254.    Because the misappropriation described in this Complaint and in this Count VII was willful and malicious, HBF is entitled to recover treble damages, or punitive damages of up to twice actual damages, under Va. Code § 59.1-338(B), plus attorneys' fees under Va. Code § 59.1-338.1.

255.    Because any such damages, and any other remedy at law, will not suffice to rectify or cure Gilman's past violations, or deter or prevent its future violations, of the Virginia Uniform Trade Secrets Act, this Court may enjoin any and all misappropriation of protected trade secret information under Va. Code § 59.1-337.

## COUNT VIII:
### Western's' Violations of Virginia Uniform Trade Secrets Act

256.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

257.   In its dealings with HBF's then-employee Lisa Jones for its own economic benefit, Western's at relevant times knew that Jones was an HBF employee with the title and duties of Director of New Business Development.

258.   Western's knew or should have known that information it received from Jones while she was an HBF employee was information belonging to HBF that Jones obtained in her capacity as an HBF employee.

259.   Western's knew or should have known that information which it received from Jones had economic value to HBF and was not generally known or easily assembled.

260.   Western's knew or should have known that the information it was receiving from Jones included non-public information belonging to HBF concerning actual or potential HBF customers and/or specific markets or programs within the U.S. food purchasing and distribution sector.

261.   Such information included any or all of the following, without limitation: key personnel names; corporate addresses, email addresses and telephone numbers; customers' buying history or requests, including but not limited to food flavor, food type, ingredients, production formula, nutritional requirements, item size or weight, and packaging and product volume histories; customers' pricing sensitivity; aggregate sales potential to particular customers at specific price points; customers' shipping and delivery requests; customers' financial condition and/or creditworthiness; and customers' business relationships.

262.   Western's knew or should have known, from its commercial relations with HBF, that HBF made reasonable efforts to have its employees maintain the secrecy of HBF's trade secret information.

263.    Western's knew or should have known that Jones, while she was an employee of HBF, was presenting information to Western's which, under prevailing industry standards, norms, customs and practices, was for access and use exclusively by HBF.

264.    Western's knew or should have known that Jones, while she was an employee of HBF, had obtained the information described in the preceding paragraphs by improper means and/or conveyed it to Western's by improper means.

265.    Western's knew or should have known, based on the foregoing, that information it was obtaining from Jones was protected HBF trade secret information.

266.    Western's knew or should have known that Jones was providing it with this trade secret information without HBF's express or implied consent.

267.    At times when Jones was disclosing HBF trade secret information to Western's, Western's knew or should have known that its knowledge of the HBF trade secrets was derived from or through Jones, who owed HBF a duty to maintain its secrecy and/or to limit its use to purposes benefiting HBF.

268.    Western's rewarded Jones with an economic benefit to her personally, *i.e.,* brokerage fees and/or commissions, for disclosing HBF trade secret information as alleged herein.

269.    In acting as alleged in this Count VIII, Western's violated the Virginia Trade Secrets Act, Va. Code § 59.1-336 *et seq.*

270.    Western's' violations of the Virginia Trade Secrets Act as alleged in this Count VIII resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

271.    Because the misappropriation described in this Complaint and in this Count VIII was willful and malicious, HBF is entitled to recover treble damages, or punitive damages of up to twice actual damages, under Va. Code § 59.1-338(B), plus attorneys' fees under Va. Code § 59.1-338.1.

272.    Because any such damages, and any other remedy at law, will not suffice to rectify or cure Western's' past violations, or deter or prevent its future violations, of the Virginia Uniform Trade Secrets Act, this Court may enjoin any and all misappropriation of protected trade secret information under Va. Code § 59.1-337.

## COUNT IX:
### *Jones' Tortious Conversion of Property under Virginia Common Law*

273.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

274.    Because Defendant Jones was HBF's employee, the business-related information she acquired during and in the scope of her employment became the property of HBF at the moment it was acquired, and never belonged to her.

275.    Jones knew, while she was in HBF's employ, that she was aggregating economically and reputationally valuable information concerning (a) actual or potential HBF customers, and (b) food manufacturers who were upstream suppliers to HBF (directly or indirectly) and/or to companies whose food products HBF private-labeled or distributed.

276.    HBF owned, and had an immediate and exclusive right to possess, all the non-public business-related information that Defendant Jones acquired while she was HBF's employee.

277.    Jones had no right to deny such information to HBF, whether by hiding it from HBF, by denying HBF access to or knowledge of it, by trying to delete evidence of it, or by any other means.

278.    Nevertheless, Jones affirmatively failed and/or refused to convey to HBF a wide array of information that she was charged by HBF to acquire and did acquire as an HBF employee.

279.    Jones knew that by sequestering such information from HBF she was contravening repeated instructions and expectations from HBF management to provide that information to HBF (*e.g.*, repeated HBF instructions that Jones enter into HBF's Salesforce software system all sales-related data that she had developed or obtained while she was an HBF employee, and repeated instructions that Jones provide detailed written reports of her activities to HBF).

280.    While an HBF employee, and without HBF's knowledge, authorization or consent, Jones downloaded, copied, or otherwise converted to her own possession and use, records of proprietary and economically valuable HBF information, including HBF data on actual or potential customers; actual or potential upstream suppliers to HBF; HBF's business methods; the credit histories of HBF customers; the electronic signature block of an HBF co-owner; and other trade secret information that HBF kept in databases and files that it explicitly directed its employees to keep confidential as alleged in this Complaint.

281.    Jones was aware of her obligation not to use, without HBF's knowledge, authorization and consent, the types of proprietary and trade secret information described above for her own or for a third party's benefit, in any manner or for any purpose.

282.    By downloading, copying, or otherwise converting to her own possession and use the trade secret information described in this Count IX, Jones acted wrongfully to assert or

exercise control or ownership over the information, and/or actively interfered with HBF's ownership and control of that information, depriving HBF of its right to possess and use the information.

283.   By affirmatively concealing information she had gathered while employed by HBF,  under a duty to disclose it to HBF and to refrain from using it at HBF's expense, Jones acted wrongfully to assert or exercise control or ownership over the information, and/or actively interfered with HBF's ownership and control of that information, depriving HBF of its right to possess and use the information.

284.   In so doing, Jones committed the tort of conversion of HBF's property.

285.    Jones' acts and omissions described in this Count IX resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

286.   The wrongful acts by Jones described in this Count IX were willful, malicious, and egregious, *inter alia* in that they, and each of them, were a stinging personal betrayal of a working relationship that HBF and its owners had taken great pains to nourish, and because Jones pursued a pattern of brazen and remorseless lies to HBF and its owners, almost daily for a year or more, to further her purpose to defraud her employer. Therefore, HBF is entitled to recover punitive damages from Jones.

### COUNT X:
*Jones' Civil Fraud against HBF under Virginia Common Law*

287.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

288.   Defendant Jones falsely represented to HBF, while employed as its Director of Business Development, that certain food distribution markets were unlikely to yield viable returns for HBF and were not worth pursuing aggressively.

289.   In so doing, Jones falsely represented present and material facts.

290.   The food distribution markets in question were of interest to HBF, as Jones well knew, and could have led to viable returns for HBF if Jones had not falsely represented to HBF, and/or deliberately withheld from HBF, material facts concerning those markets, and thereby kept HBF from entering those markets.

291.   Jones knew when she made the representations described in the preceding paragraph that they were false.

292.   Jones made these false representations deliberately, knowingly, and with intent to mislead HBF.

293.   Jones made these false representations in a deliberate attempt to keep for herself the business she knew could be developed in those markets, and the profits she intended to realize there.

294.   By affirmative statements, by omissions, and by concealment of information, Jones falsely and repeatedly represented to HBF that the business she was conducting with Gilman and Western's, respectively, was for the benefit of HBF and not for herself.

295.   Each time she made a false representation described in the preceding paragraph, Jones knew that it was false.

296.   Jones made these false representations deliberately, knowingly, repeatedly, and each time with intent to mislead HBF, in order to keep for herself the brokering business she was conducting and developing with Gilman and/or Western's at HBF's expense as alleged in this Complaint.

297.    Jones further intentionally misrepresented material facts, with intent to mislead HBF, by deliberately omitting to inform HBF for many months, and affirmatively concealing from HBF for all that time, that she was developing personal business relationships with Gilman and/or Western's at HBF's expense using HBF's name, reputation and resources.

298.    In reasonable reliance on Jones' misrepresentations by commission, omission and concealment as described in the preceding paragraphs, HBF did not pursue the business opportunities that Jones had deprecated or failed to disclose; did not develop pricing, packaging, flavors, quantities, shipping arrangements and/or other logistics that could have ripened those opportunities into actual business; did not demand verification of time Jones spent on HBF business during business trips made at HBF's expense; did not investigate whether Jones had promoted Gilman products at trade shows that she attended on HBF business and at HBF's expense; did not investigate whether Jones was working on her own business on HBF company time; did not question the propriety of an invoice that was inadvertently transmitted to HBF for sales that Jones was secretly brokering between Western's and a customer of HBF for her own gain; and did not confront Jones, Gilman, or Western's with questions about Jones' dealings with those companies and/or their own actions with Jones that excluded HBF from the chain of commerce.

299.    Jones' actions described in this Count X resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

300.    The misappropriations by Jones described in this Complaint and in this Count X were willful, malicious, and egregious, *inter alia* in that they, and each of them, constituted a

betrayal of the working relationship that HBF, through its owners, had devoted substantial

time, resources and care to nourishing, and because for a year or more Jones pursued a

pattern of deceiving HBF and its owners to further a purpose to defraud her employer.

Therefore, HBF is entitled to recover punitive damages from Jones.

## COUNT XI:
### *Civil Fraud against HBF by Gilman and Western's under Virginia Common Law*

301.    The preceding allegations of this Complaint are incorporated herein in their

entirety by reference.

302.    Defendants Gilman and Western's each intentionally misrepresented

numerous material facts, with intent to mislead HBF, by deliberately omitting to inform HBF

for many months, and affirmatively concealing from HBF for all that time, that they and each

of them were developing business relationships with Jones, and through her with HBF's

actual and potential customers, for their own and Jones' gain and at HBF's expense.

303.    In reasonable reliance on Gilman's and Western's' misrepresentations by

commission, omission and concealment as described in the preceding paragraphs, HBF did

not pursue the business opportunities that Jones had deprecated or failed to disclose; did not

develop pricing, packaging, flavors, quantities, shipping arrangements and/or other logistics

that could have ripened those opportunities into actual business; did not demand verification

of time Jones spent on HBF business during business trips made at HBF's expense; did not

investigate whether Jones had promoted Gilman products at trade shows that she attended on

HBF business and at HBF's expense; did not investigate whether Jones was conducting her

own business affairs on HBF company time; did not investigate the propriety of an invoice

that was inadvertently transmitted to HBF for sales that Jones in fact was secretly brokering

between Western's and a customer of HBF for her own gain; and did not confront Jones,

Gilman, or Western's with questions about Jones' dealings with those companies and/or their own actions with Jones that excluded HBF from the chain of commerce.

304.   Gilman's and Western's' actions described in this Count XI resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

305.   The misrepresentations by Gilman and Western's described in this Complaint and in this Count XI were willful, malicious, and egregious, *inter alia* in that they, and each of them, aided, abetted and compounded Jones' personal betrayal of her working relationship with HBF and its owners, and because for many months Gilman and Western's each pursued a pattern of deceiving HBF and its owners to further their purpose to defraud HBF. Therefore, HBF is entitled to recover punitive damages from each of them.

### COUNT XII:
*Jones and Gilman's violations of Va. Code § 18.2-500, statutory civil conspiracy*

306.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

307.   As shown in the foregoing paragraphs of this Complaint, Defendants Jones and Gilman, respectively, have violated underlying provisions of Virginia law and have committed intentional torts, and defendant Jones has breached her contractual obligations to HBF in respect of commercial activities that Jones and Gilman engaged in with one another while and after Jones was HBF's Director of New Business Development.

308.   Jones and Gilman acted in concert to make sales of Gilman's food products directly to customers that Jones identified and pursued while employed by HBF and while identifying herself as HBF's Director, New Business Development.

309.    In taking the actions described in the two preceding paragraphs, Jones and Gilman combined and conspired to excise HBF from the relevant market, and/or to diminish HBF's market share and/or revenue base.

310.    In so doing, Jones and Gilman willfully and maliciously injured HBF in its reputation, trade and business.

311.    The concerted conduct of defendants Jones and Gilman violated Va. Code § 18.2-499 and is actionable under Va. Code § 18.2-500.

312.    Jones' and Gilman's actions described in this Count XII resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

313.    The concerted conduct of defendants Jones and Gilman described herein was willful, malicious, and egregious, *inter alia* in that it was a betrayal of working relationships that HBF's owners had devoted time, expense, resources and care to nourishing, and because for a year or more Jones pursued, and Gilman participated in, a pattern of deceiving HBF and its owners to further their purpose to enrich themselves at HBF's expense. Therefore, HBF is entitled to recover punitive damages from Jones and Gilman, jointly and severally.

## COUNT XIII:
### *Jones' and Gilman's Civil Conspiracy under Virginia Common Law*

314.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

315.    Through intentionally tortious acts that they each committed, as described specifically elsewhere in this Complaint, Defendants Jones and Gilman combined to accomplish, by concerted action, commercial transactions that had the tortious and otherwise

unlawful purpose of interfering with HBF's business relationships and depriving it of sales revenues, profits, and other business benefits.

316.    Jones' and Gilman's actions described in this Complaint and in this Count XIII resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

317.    The concerted conduct of defendants Jones and Gilman described herein was willful, malicious, and egregious, *inter alia* in that it was a betrayal of working relationships that HBF's owners had devoted time, expense, resources and care to nourishing, and because Jones pursued, and Gilman participated in, a pattern of deceiving HBF and its owners to further their purpose to enrich themselves at HBF's expense. Therefore, HBF is entitled to recover punitive damages from Jones and Gilman, jointly and severally.

## COUNT XIV:
### *Jones and Western's' Violations of Va. Code § 18.2-500, Statutory Civil Conspiracy*

318.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

319.    As shown in the foregoing paragraphs of this Complaint, Defendants Jones and Western's, respectively, have violated underlying provisions of Virginia law and have committed intentional torts, and defendant Jones has breached her contractual obligations to HBF in respect of commercial activities that Jones and Western's engaged in with one another.

320.    Jones and Western's acted in concert to sell Western's food products directly to customers that Jones identified and pursued while employed by HBF and while identifying herself as HBF's Director, New Business Development.

321.    In taking the actions described in the two preceding paragraphs and throughout this Complaint, Jones and Western's combined and conspired to excise HBF from the relevant market, and/or to diminish HBF's market share and/or revenue base.

322.    In so doing, Jones and Western's willfully and maliciously injured HBF in its reputation, trade and business.

323.    The concerted conduct of defendants Jones and Western's violated Va. Code § 18.2-499 and is actionable under Va. Code § 18.2-500.

324.    Jones' and Western's' actions described in this Complaint and in this Count XIV resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

325.    The concerted conduct of defendants Jones and Western's described herein were willful, malicious, and egregious, *inter alia* in that it was a betrayal of working relationships that HBF's owners had devoted time, expense, resources and care to nourishing, and because Jones pursued, and Western's participated in, a pattern of deceiving HBF and its owners to further their purpose to enrich themselves at HBF's expense. Therefore, HBF is entitled to recover punitive damages from Jones and Western's, jointly and severally.

## COUNT XV:
### *Jones' and Western's' Civil Conspiracy under Virginia Common Law*

326.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

327.    Through intentionally tortious acts that they each committed, Defendants Jones and Western's combined to accomplish, by concerted action, commercial transactions

that had the tortious and otherwise unlawful purpose of interfering with HBF's business relationships and depriving it of sales revenues, profits, and other business benefits.

328.   Jones' and Gilman's actions described in this Complaint and in this Count XV resulted in damages to HBF to be proven at trial, including but not limited to loss of business opportunities, loss of sales, loss of revenue, loss of profits, loss of business reputation, corporate value and goodwill, and pecuniary and non-pecuniary losses to the owners of HBF.

329.   The concerted conduct of Jones and Gilman described herein was willful, malicious, and egregious, *inter alia* in that it was a betrayal of working relationships that HBF's owners had devoted time, expense, resources and care to nourishing, and because Jones pursued, and Gilman participated in, a pattern of deceiving HBF and its owners to further their purpose to enrich themselves at HBF's expense. Therefore, HBF is entitled to recover punitive damages from Jones and Gilman, jointly and severally.

<u>**COUNT XVI:**</u>
*Jones' unjust enrichment at HBF's expense*

330.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

331.   HBF conferred various economic and reputational benefits on defendant Jones while she was HBF's Director of Business Development, including:

a.       Salary paid weekly;

b.       Commissions paid quarterly based on the volume of sales Jones generated between HBF's existing customers and HBF as a private labeler or distributor of food products;

c.       Non-pay and non-commission benefits to which HBF economically contributed on Jones' behalf (e.g., health insurance and I.R.C. § 401(k) account); and

d.      The reputational benefit of holding herself out as HBF's Director of Business

Development, legitimizing her in the eyes of actual and potential customers and

increasing her ability to generate sales.

332.   Based on her experience as an HBF employee and as its Director of Business

Development, Jones knew of the benefits set forth in the preceding paragraph.

333.   Jones should have expected to repay HBF:

a.      for any and all economic and reputational benefits that she received from

HBF while developing business relationships with Gilman or Western's for her own

gain and at HBF's expense;

b.      for any and all economic and reputational benefits she received from HBF

that made her able, or enhanced her ability, to sell food products directly to actual and

potential downstream customers of HBF; and/or

c.      for any and all economic and reputational benefits she received from HBF

that made her able, or enhanced her ability, to generate sales from suppliers of goods

which HBF was capable of private-labeling or otherwise distributing but which she

instead arranged for Gilman and Western's, respectively, to transact directly with

actual and potential HBF customers for their own gain and at HBF's expense.

334.   For all such sales, Defendant Jones accepted the economic and reputational

benefits she received from HBF without paying HBF for their value.


### COUNT XVII:
*Gilman's unjust enrichment at HBF's expense*


335.   The preceding allegations of this Complaint are incorporated herein in their

entirety by reference.

336.   By unwittingly subsidizing Jones' misdeeds as alleged in this Complaint, HBF conferred various economic and reputational benefits on Gilman that unjustly enriched Gilman, including:

a.      The profits flowing from sales executed by Gilman to actual and potential HBF customers through Jones' unauthorized brokering;

b.      The profits flowing from Jones' ability to generate increased future sales for Gilman at HBF's expense, including profits Gilman will receive from future transactions brokered by Jones, or business relationships established with her help, that exploit HBF's name, reputation and resources but deliberately exclude HBF as alleged in this Complaint;

c.      The economic value of HBF trade secret information that Jones improperly used and/or made available for Gilman's present and future economic benefit; and

d.      The reputational benefit to Gilman of Jones' working on its behalf, while she held herself out as HBF's Director of New Business development, to determine and stimulate the interest of actual and potential HBF customers in Gilman food products.

337.   On information and belief, Gilman, based on its years of experience as a food producer working with private labelers in the food sector and selling its own food products directly to end-user customers, knew that each of the benefits set forth in the preceding paragraph had economic and/or reputational value.

338.   Gilman has accepted and will continue to accept the benefits set forth above without expecting to pay HBF for their value, including the following:

a.      The value of Jones' exploration of possible sales by Gilman directly to actual and potential customers of HBF; and

b.      The value of profits from Gilman's future sales of food products that HBF was capable of private-labeling or otherwise distributing, but which Gilman, using Jones' unauthorized services while she was HBF's Director of New Business Development, instead sold (and in the future will sell) directly to actual and potential HBF customers.

339.    Defendant Gilman accepted the economic and reputational benefits set forth above from HBF without re-paying HBF for their value.

## COUNT XVIII:
### *Western's' Unjust Enrichment at HBF's Expense*

340.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

341.    By unwittingly subsidizing Jones' misdeeds as alleged in this Complaint, HBF conferred various economic and reputational benefits on Western's that unjustly enriched Western's, including:

a.      The profits flowing from sales executed by Western's to actual and potential HBF customers through Jones' unauthorized brokering;

b.      The profits flowing from Jones' ability to generate increased future sales for Western's at HBF's expense, including profits Western's will receive from future transactions brokered by Jones, or business relationships established with her help, that exploit HBF's name, reputation and resources but deliberately exclude HBF as alleged in this Complaint;

c.      The economic value of HBF trade secret information that Jones improperly used and/or made available for Western's' present and future economic benefit; and

d.      The reputational benefit to Western's of Jones' working on its behalf, while she held herself out as HBF's Director of New Business development, to determine and stimulate the interest of actual and potential HBF customers in Western's' food products.

342.   On information and belief, Western's, based on its years of experience as a food producer working with private labelers in the food sector and selling its own food products directly to end-user customers, knew that each of the benefits set forth in the preceding paragraph had economic and/or reputational value.

343.   Western's has accepted and will continue to accept the benefits set forth above without expecting to pay HBF for their value, including the following:

a.      The value of Jones' exploration of possible sales by Western's directly to actual and potential customers of HBF; and

b.      The value of profits from Western's' future sales of food products that HBF was capable of private-labeling or otherwise distributing, but which Western's, using Jones' unauthorized services while she was HBF's Director of New Business Development, instead sold (and in the future will sell) directly to actual and potential HBF customers.

344.   Defendant Western's accepted the economic and reputational benefits set forth above from HBF without paying HBF for their value.

**<u>PRAYER FOR RELIEF</u>**

Based on the foregoing allegations, Plaintiff Highland Beef Farms, Inc., prays for the following relief:

345.    A declaration pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §

2201 *et seq.*, that Defendants Lisa Jones, National Supply Network, LLC, Gilman Cheese

Corporation, and Western's Smokehouse, LLC have committed the torts and other unlawful

acts against HBF that are alleged in this Complaint as to each Defendant.

346.    A preliminary and permanent injunction under Va. Code §§ 8.01-620 and 628;

Va. Code § 18.2-500(b); and Va. Code § 59.1-337(A) and (C), requiring the Defendants, and each

of them, as well as their agents, successors, assigns and employees:

    a.  To cease and desist immediately from the tortious and otherwise unlawful acts
alleged herein;

    b.  To give immediate notice of the judgment in this case to each of the vendors
and customers shown at trial to have made or received business contacts that
flowed or were derived from the tortious and otherwise unlawful acts
complained of herein;

    c.  To cease, for a period of two (2) years from the date of judgment, all business
relations with the vendors and customers referred to in the preceding
subparagraph, and to cooperate fully with HBF's efforts to establish or re-
establish business relations with those vendors and/or customers; and

    d.  To submit to this Court, with service on HBF, on the thirtieth (30th) day after
this judgment is entered, on the last day of that month and every month
thereafter for a period of eighteen (18) months, in a manner satisfactory to the
Court for assessment of each Defendant's compliance with this judgment:

        i.  In the case of Defendants Gilman and Western's, a full and complete
report of all revenues, expenditures, executive compensation paid or
deferred, profits, losses, earnings, taxes, depreciations, amortizations,

assets and liabilities, by product, vendor and customer, in the businesses of each Defendant, according to generally accepted accounting principles, and

ii.  In the case of Defendants Jones and National Supply Network, LLC, copies of all bank account statements and supporting documentation of all credits to, and debits from, those accounts.

347.  An award of compensatory damages against the Defendants and each of them, jointly and severally, to be proven at trial, representing:

a.  Lost profits from sales and other revenues listed at Paragraph 140, subparagraphs (a) through (q); Paragraph 338,  subparagraphs (a) through (d); and Paragraph 340.

b.  To the extent not prayed for above, profits that would have flowed to HBF but for the loss or impairment of its business relationships, market share, goodwill, settled customer expectations, and/or business reputation for probity and reliability with all suppliers and customers with whom Defendant Jones had deceitful or self-dealing interactions.

c.   To the extent not prayed for above, loss to the corporate value of HBF, both as a business and as the life's work of its owners.

d.  To the extent not prayed for above, business losses including loss of HBF staff time and loss of business opportunities that HBF could have pursued but for this litigation.

348.  An award of punitive damages as permitted by Va. Code § 59.1-338(B), and treble damages pursuant to Va. Code § 18.2-500(a), in amounts to be proven at trial.

349.   An award of HBF's costs in this matter, including attorneys' fees pursuant to Va. Code § 18.2-500(a), Va. Code § 18.2-152.12 and Va. Code § 59.1-338.1; and

350.   An award of such other and further relief as is just.

### Jury Trial Demand

351.   A trial by jury is demanded for all issues so triable.

Respectfully submitted,

_____
Stephen B. Pershing, Esq.
Virginia Bar No. 31012
Pershing Law PLLC
1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431
steve@pershinglaw.us

_____/s/_____
Elliot D. Eder, Esq.
(Admission *pro hac vice* pending)
D.C. Bar No. 424527
Eder Law PLLC
1629 K Street, N.W., Ste. 300
Washington, D.C. 20006
(703) 655-3638
eder@att.net

*Counsel for plaintiff*

Dated: May 25, 2018